**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Andrew S.F. Cullen**</u>

    **v.**                                        Civil No. 14-cv-110-PB
                                               Opinion No. 2015 DNH 212
<u>**Neal R. Janvrin, et al.**</u>


<u>**MEMORANDUM AND ORDER**</u>

Andrew Cullen was arrested in 2011 for allegedly raping a
mentally handicapped woman at gunpoint.  The charges against him
were dismissed prior to indictment and Cullen later sued Fremont
Police Chief Neal Janvrin, Sergeant Adam Raymond, and the Town
of Fremont.  Cullen claims that Janvrin and Raymond mislead the
magistrate who issued the warrant on which he was arrested.  As
a result, he contends that defendants arrested him for a crime
he did not commit in violation of his rights under the Fourth
Amendment.  He also asserts state law claims for false
imprisonment and malicious prosecution.  Defendants have moved
for summary judgment on all counts.  For the reasons set forth
below, I grant defendants' motion for summary judgment with
respect to Cullen's federal claims and dismiss his state law
claims without prejudice to his right to refile the claims in
state court.

## I.  <u>BACKGROUND</u>

On November 9, 2011, Deputy Chief George Bassett of the
Fremont Police Department received a phone call from Lisa Tyler
of the New Hampshire Bureau of Adult Services.  Tyler told
Deputy Chief Bassett that "CL," a then-20 year old woman with
certain mental handicaps, had reported that she had been raped
by Andrew Cullen, the son of CL's foster mother, Annemarie
Cullen.  Bassett assigned the case to Sergeant Adam Raymond, a
Fremont police officer, for further investigation.  Doc. No. 17-
12 at 1.

That same day, Sergeant Raymond spoke with Tyler, who
explained CL's rape accusations and informed Raymond that CL had
a "cognitive learning delay."[1]  Doc. No. 17-11 at 9 (excerpts

---

[1] In his deposition, Sergeant Raymond states that, during
the investigation, he generally understood CL's mental handicap
to be "cognitive learning delay."  Doc. No. 16-19 at 3.  The
transcript reads:

[PLAINTIFF'S COUNSEL]: Did you ever find out what the
extent of her mental handicap was?

[RAYMOND]: I believe at one time I had a conversation
with somebody who said that – who gave me sort of a
terminology of what she would be considered...

[Raymond examines his report]

[RAYMOND]: On page two [of my report], it states that
I had spoke [sic] to Ms. Tyler, and she stated that CL
has a cognitive learning delay.  <u>Id.</u>

from Raymond's deposition).  Raymond asked Tyler who he needed
to contact to get access to CL's medical records.  Tyler
suggested that Raymond contact Easter Seals, a non-profit foster
care organization working with CL.[2]  See Doc. No. 17-12 at 2-3.
Raymond also contacted Samantha Mick at the Child Advocacy
Center ("CAC") to request that CAC conduct a forensic interview
of CL.[3]

The next day, Tyler faxed Sergeant Raymond her written
report containing details of CL's allegations.  See Doc. No. 16-
22.  Attached to Tyler's report was an incident report from an
Easter Seals employee named Beth Mack, who first recorded the
allegations.[4]  Raymond then began his investigation, speaking
with Erin Sokul, CL's then-caregiver, and Jennica Creighton, an
Easter Seals employee familiar with the situation.  See Doc. No.
16-16 at 4.

---

[2] Raymond claims that he attempted to obtain CL's medical
records, but there is no evidence in the record to show that he
actually obtained the records.  See Doc. No. 17-11 at 18.

[3] According to Sergeant Raymond, CAC frequently interviews
crime victims who are children or mentally handicapped.  See
Doc. No. 16-19 at 6.

[4] The Mack incident report indicated that CL complained she
had been assaulted by someone named "Alex," who was "Annemarie
[Cullen's] son."  Doc. No. 16-23 at 1.  The report noted that
"Alex" "comes in [CL]'s room and beats [her] and pulls his pants
down" and that "Alex" made her promise not to tell anyone.  Id.
The location of the incident was reportedly "in the car."  Id.

On November 23, 2011, CAC employee Meghan Lennon conducted a forensic interview of CL at the CAC facility in Portsmouth. Sergeant Raymond and Assistant Rockingham County Attorney Jerome Blanchard watched the interview from a separate room.  During the interview, CL provided further details regarding the alleged rape.  She claimed that, when no one else was home, Cullen came into her room, "crawl[ed]" on her and began kissing her.  Doc. No. 16-20 at 8-9.  CL reported that she "scream[ed] so loud" and tried to move away from Cullen, but he "pulled [her] on the bed."  Id. at 11-12.  Cullen then reportedly took CL's pants off, took off his own pants, and "put it in [her]."  See id. at 9, 13-14.  He "put his dink[] in [her] mouth," "beat" her and "there was blood."  See id. at 15, 25.  CL claimed that she was "[b]ruised bad, red and bruised."  Id. at 12.

During the same interview, CL stated that the assault first occurred "in [her] room," but later stated that Cullen "beat [her] up" in "Andrew's room, downstairs," and raped her another time in "[t]he bathtub and the shower and the toilet."  Id. at 17-18, 27.  Additionally, she claimed that Cullen threatened to kill her, that he "killed [her] baby," and "killed [her]."  Doc. No. 16-20 at 16, 28, 30.

In the weeks after the CAC interview, Sergeant Raymond attempted to speak with the Cullens about the allegations.

According to his police report, on December 1, 2011, Raymond called the Cullen residence and spoke with Francis Cullen, who advised Raymond to speak with his wife about the incident.  Doc. No. 16-16 at 8.  Later that day, Raymond reached Annemarie Cullen and asked to speak in person with her, Andrew, and Mary Cullen about the allegations.  Id.  After a brief discussion, Annemarie expressed discomfort at meeting the police and ended the conversation.  Id.

A week later, on December 8, 2011, Sergeant Raymond visited the Cullen residence in an attempt to speak with Andrew or Mary Cullen.  Id. at 9.  After a brief discussion, Francis and Mary Cullen indicated they had hired a lawyer and declined to speak further about the incident.  Id.

Sergeant Raymond did, however, speak with Andrew Cullen the next day, when Cullen appeared at the Fremont Police Department and asked to speak with Raymond.  Id. at 10.  Cullen introduced himself and asked if he was "being charged at this time."  Id. Raymond informed Cullen that he would like to have a "full conversation" with him, but Cullen declined to speak further without a lawyer present.  Id.  Cullen was not arrested, but Raymond indicated in his report that he intended to apply for an arrest warrant following that conversation.  Id.

On December 15, 2011, Sergeant Raymond interviewed CL along

with Easter Seals employee Jennica Creighton.  According to
Raymond's report, CL reported that, on the day that Cullen "beat
her up and humped her," he had a gun with him that was "black
and small."[5]  Id. at 11.  CL claimed that Cullen took the gun out
of his pocket, "poked her in the chest with it," and later "put
the gun to her head and was tapping her in the head" with the
"point of the gun."  Id.  She stated that Cullen sometimes kept
the gun in his bedroom.  Id.

      That same day, Sergeant Raymond drafted an affidavit and
applied for warrants to arrest Cullen and to search his
residence.  See Doc. Nos. 17-15; 16-18. Raymond's affidavit in
support of the arrest warrant stated that CL was a "mentally
handicapped person" who claimed – to Easter Seals and in an
interview at the CAC – that Cullen had sexually assaulted her
while they were home alone and CL was "under [Cullen's] care and
supervisor [sic]."  Doc. No. 17-15.  The affidavit alleged that
the assault occurred "within the time frame of late September
and early October 2011."  Id.  It also stated that Cullen forced

_____

      [5] Sergeant Raymond contends that CL first claimed that
Cullen had used a gun during the CAC interview. The transcript
of the CAC interview cuts off after twenty-nine minutes and does
not include this statement about the gun.  Raymond includes
mention of a gun in his subsequent report.  See Doc. No. 16-16
at 7.  In his deposition, however, prosecutor Blanchard denied
that a firearm was mentioned during the CAC interview.  See Doc.
No. 55 at 2.

CL to have intercourse and that he "penetrated her vagina with his penis."  Id.

Sergeant Raymond appeared before Judge Robert LaPointe, who issued both warrants.  See Doc. Nos. 16-17; 16-18.  Later that day, Raymond and two deputies executed the search warrant at the Cullen residence and found a number of weapons, including a small black handgun in Cullen's bedroom.  Doc. No. 16-16 at 12-13.  Cullen, however, was not home and was not arrested.

The next day, December 16, 2011, the Rockingham County Attorney's Office contacted Chief Janvrin to ask why Cullen had not been arrested.  See Doc. No. 16-13 at 3.  Deputy County Attorney Tom Reid and Blanchard met with Janvrin and Deputy Bassett and Reid ordered Janvrin to reword the affidavit and apply for a new arrest warrant.[6]  See Doc. Nos. 16-11; 16-5 at 3.  Because Sergeant Raymond was not working that day, Janvrin made out a new affidavit using the same facts as set out in the Raymond affidavit and received a new arrest warrant, this time from Justice of the Peace Timothy Louis.  Doc. Nos. 17-16 at 7; 16-12.

---

[6] In his deposition, Chief Janvrin states that Deputy County Attorney Reid instructed him to reword the body of the complaint to say that Cullen "knowingly" engaged in sexual penetration through the application of physical force.  Doc. No. 18-3 at 3. Nonetheless, the Janvrin affidavit repeats nearly word for word the same facts as the Raymond affidavit from a day earlier. Compare Doc. No. 16-17, at 1 with Doc. No. 16-12, at 1.

7

On December 19, 2011, Cullen appeared at the Fremont Police Department and was arrested for aggravated felonious sexual assault.  He was released on bond later that day.  Two months later, on February 23, 2012, a probable cause hearing was held before Circuit Court Judge John Coughlin who found no probable cause for the charges against Cullen.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must consider the evidence submitted in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  <u>See</u> Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first show that there is no genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A material fact "is one 'that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Prop. with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the moving party satisfies this burden, the nonmoving party must then "produce

evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III.  ANALYSIS

Cullen asserts four claims for relief.  First, he alleges that Chief Janvrin and Sergeant Raymond are personally liable because they arrested him in violation of his Fourth Amendment rights.  Next, he charges that the Town of Fremont is liable for Janvrin's unconstitutional acts because Janvrin was acting as a municipal policymaker when he arrested Cullen.  Cullen's final two claims allege that Janvrin and Raymond are liable under state law for false imprisonment and malicious prosecution.[7]

### A.  Fourth Amendment Claim Against Chief Janvrin and Sergeant Raymond

Cullen's Fourth Amendment claim against Chief Janvrin and Sergeant Raymond rests on his contention that Janvrin and Raymond obtained the warrant they used to arrest him by making

---

[7] The complaint includes an additional claim arguing that Chief Janvrin and Sergeant Raymond violated Cullen's Fifth Amendment rights but Cullen has since abandoned his Fifth Amendment claim.  See Doc. No. 17-1 at 20.

material misstatements in the warrant application, omitting

material facts, and failing to conduct a sufficient

investigation.[8]   To the extent that Cullen seeks to hold Janvrin

and Raymond personally liable for their alleged misconduct, both

defendants argue that they are entitled to qualified immunity.

---

[8] Cullen also argues that the defendants are liable because
they could not reasonably have believed that they had probable
cause to arrest him.  This argument is a nonstarter because it
fails to account for the fact that defendants obtained a warrant
rather than making the arrest on their own authority.  In such
cases, the officer ordinarily is entitled to rely on the issuing
Magistrate's probable cause determination when making an arrest.
Messerschmidt v. Millender, 132 S. Ct. 1235, 1244-45 (2012).
Although there are limited exceptions to this general rule, the
exceptions all focus on the sufficiency of the warrant
application and the process by which the warrant was obtained
rather than the reasonableness of the officer's belief that he
had probable cause to make an arrest.  See, e.g., id. at 1245
n.1 (noting that Leon's objective reasonableness standard
determines when an officer is entitled to qualified immunity);
United States v. Leon, 468 U.S. 897, 922-23 (1984) (identifying
circumstances when evidence obtained pursuant to an invalid
warrant will be subject to exclusionary rule).  Thus, when a
plaintiff complains that he was arrested pursuant to a warrant
that was not supported by probable cause, the plaintiff must
demonstrate that the warrant was "based on an affidavit so
lacking in indicia of probable cause as to render official
belief in its existence entirely unreasonable." Messerschmidt,
132 S. Ct. at 1245 (quoting Leon, 468 U.S. at 923).  In the
present case, the warrant application plainly satisfies the
probable cause standard.  Accordingly, Cullen cannot prevail
merely by demonstrating that the defendants could not have
reasonably believed that they had probable cause to arrest him.
Instead, he must prove that they knowingly or recklessly made
material misstatements in the warrant application, omitted
material facts from the application, or failed to conduct a
sufficient investigation before making an arrest.

The Supreme Court has explained that a local government official is entitled to qualified immunity for a federal statutory or constitutional violation

> [U]nless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.  To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he was doing violates that right.  When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (citations and internal punctuation omitted); see also Mullenix v. Luna, No. 14-1143, 2015 WL 6829329, at *3 (U.S. Nov. 9, 2015) (reaffirming this standard).  In determining whether a constitutional right has been clearly established, a court may not simply state the right at a high level of generality and then determine whether the facts of the case fit within the scope of the generally stated right.  Instead, a court must determine whether the law is clearly established "in light of the specific context of the case, not as a broad general proposition." Mullenix, 2015 WL 6829329, at *3 (citation and internal punctuation omitted).

Both the Supreme Court and the First Circuit have determined that a police officer violates the Fourth Amendment by intentionally or recklessly making material false statements in a warrant application or by omitting material facts from the

11

application.  See Franks v. Delaware, 438 U.S. 154, 171-72 (1978); Burke v. Town of Walpole, 405 F.3d 66, 81-82 (1st Cir. 2005).  In considering whether misstatements or omissions are material, a reviewing court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause."  Burke, 405 F.3d at 82.  If a reasonable magistrate could find probable cause from the corrected affidavit, the alleged misstatements or omissions will not support a Fourth Amendment Claim.  In sum, an officer violates the Fourth Amendment by making misstatements and omissions in a warrant application only if: (1) the misstatements and omissions were intentional or reckless, and (2) the corrected statements would prevent a finding of probable cause.

I examine each of Cullen's Fourth Amendment claims against Chief Janvrin and Sergeant Raymond in turn, beginning with his claim that the warrant application included material misstatements.

1.  Misstatements

Cullen claims that Chief Janvrin and Sergeant Raymond made two material misstatements in the warrant application.  First, he alleges that the officers erroneously reported that the rape

12

occurred in "late September and early October 2011."[9]   Second, he
contends that the defendants falsely claimed that CL was under
Cullen's "care and supervisor *[sic]*" when the rape occurred.   I
am not persuaded that these alleged misstatements can support a
Fourth Amendment claim against the defendants because neither
misstatement was material to the magistrate's probable cause
finding.

As I have explained, misstatements are material only if,
when corrected, they would defeat a probable cause
determination.   Here, there is only limited evidence in the
record to support defendants' statement that the rape occurred
in "late September or early October."[10]   Cullen, however, has not
explained how a probable cause finding would be undermined if I
excised this statement from the warrant application.
Similarly, even if I assume that defendants falsely claimed that
CL was under Cullen's supervision when the rape occurred - an
assumption by no means dictated by the record[11] - Cullen has

---

[9] During oral argument, plaintiff's counsel stated that this
date was "made up out of whole cloth."

[10]   Beth Mack's incident report states that the date of the
incident was "10-11-11."   Doc No. 16-23.   It is unclear,
however, whether she is referring to the date of the rape or the
date when CL reported the rape to Mack.

[11]   CL claimed that she was at home alone with Cullen when
he raped her and it is undisputed that Cullen was her foster

failed to explain why this alleged misstatement could have
affected the magistrate's probable cause finding. Accordingly,
the alleged misstatements simply do not support a Fourth
Amendment claim against the defendants.

### 2. Omissions

Cullen next argues that the defendants violated the Fourth
Amendment by omitting information from the warrant application.
In particular, Cullen faults the defendants for failing to
inform the magistrate that: (1) CL inconsistently claimed during
her interviews that the rape occurred in her bedroom, in
Cullen's room, in a bathroom, or in a car; (2) CL initially
described the incident without mentioning a gun but claimed in a
later interview that Cullen had used a gun to threaten her
during the rape; and (3) CL made incredible statements during
her interviews such as that Cullen had "killed her" and "killed
her baby." According to Cullen, these inconsistent and
outlandish statements are plainly material because, if they had
been disclosed, they would have so undermined CL's credibility
that no reasonable magistrate could have based an arrest warrant
on her claim that Cullen had raped her.

---

brother. See Doc. No. 16-20, at 10-11; 16-22, at 2 (noting
Cullen was CL's "brother (foster)"). Under these circumstances,
defendants reasonably could have believed that Cullen was
supervising CL when the rape allegedly occurred.

The principal difficulty with Cullen's argument is that he cannot point to clearly established law that required Chief Janvrin and Sergeant Raymond to include CL's allegedly inconsistent statements in the warrant application.  Existing law recognizes that a named victim's first-hand account of a crime ordinarily will support a finding of probable cause even if the victim's statement is uncorroborated.  See Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 10 (1st Cir. 2004) ("uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause").  But cf. B.C.R. Transp. Co. v. Fontaine, 727 F.2d 7, 10 (1st Cir. 1984)(rejecting the proposition that a victim's account of a crime will always establish probable cause).  It is perhaps conceivable in an extreme case that a victim's inconsistent statements could so undermine her account of a crime that it would violate the Fourth Amendment if the inconsistencies are not detailed in the warrant application. Cullen, however, has failed to identify any controlling authority that would allow a police officer to distinguish between cases in which the omission of inconsistent statements from a warrant application would be fatal, from the much more common cases in which they are simply inconsequential. Moreover, what little guidance exists from other jurisdictions

suggests that inconsistencies in a victim's account of the crime ordinarily will not defeat a probable cause determination.  See, e.g., Spiegel v. Cortese, 196 F.3d 717, 725 (7th Cir. 1999) ("Nothing suggests that a victim's report must be unfailingly consistent to provide probable cause.  The credibility of a putative victim or witness is a question, not for the police officers in the discharge of their duties, but for the jury in a criminal trial.").

This case illustrates the challenges that are presented when a police officer attempts to determine whether potential inconsistencies are sufficiently troubling to prevent a victim's report from serving as the basis for an arrest warrant.  Rape, by its nature, often involves only two witnesses - the victim and the assailant.  In some cases, the victim's word may be the only evidence the police have to justify a warrant.  In such cases, it can be extremely difficult to distinguish complaints where inconsistencies defeat probable cause from those that present only the type of routine credibility questions that are best resolved by a jury after a trial.  When, as in the present case, the alleged victim suffers from an intellectual disability, the issues are even more complex.  Given CL's disability - a fact that defendants disclosed in the warrant application - it is unsurprising that she might experience

16

difficulty in providing detailed and consistent statements about the alleged rape.  Moreover, in context, her statements that "he killed me" and "he killed my baby" are not necessarily inconsistent with her rape claim.[12]  Accordingly, it is by no means obvious that CL's allegedly inconsistent and outlandish statements would prevent a reasonable magistrate from concluding that defendants lacked probable cause to arrest Cullen.

In sum, Supreme Court precedent entitles police officers to qualified immunity for constitutional violations unless the applicable law is so clearly established that only an incompetent officer would fail to understand that his actions are improper.  See Mullenix, 2015 WL 6829329, at *3.  In the present case, existing law does not clearly require defendants to disclose the type of inconsistencies in a victim's statement that are at issue here.  Accordingly, I cannot say that only an incompetent officer in the position of the defendants would have failed to understand that he had a duty to include CL's

---

[12] For example, during the CAC interview, CL consistently references "babies" while discussing the act of rape.  When claiming that Cullen had sex with her, causing her to bleed, she says that "I had a baby."  Doc. No. 16-20 at 26.  Similarly, when asked to describe what part of her body Cullen was "inside," she states that he was "[i]n the baby" and "[h]e killed my baby."  Id. at 28.  These statements – from someone with a low level of cognitive functioning – show a simple association between the act of sex and babies, and, in context, are not as fantastical as Cullen suggests.

inconsistent statements in the warrant application.  Under these circumstances, Chief Janvrin and Sergeant Raymond are entitled to qualified immunity.[13]

    3.  <u>Duty to Investigate</u>

Cullen also claims that Chief Janvrin and Sergeant Raymond violated the Fourth Amendment by failing to investigate further before seeking an arrest warrant.  I reject this argument because clearly established law did not oblige defendants to undertake additional investigation before they applied for the warrant to arrest Cullen.

In <u>United States v. Tanguay</u>, the First Circuit recently held that a police officer should investigate further before seeking an arrest warrant even when the facts known to the officer establish probable cause if the officer has "knowledge

---

[13] Cullen also claimed during the hearing on defendants' summary judgment motion that defendants improperly omitted from the warrant application a statement made by Assistant County Attorney Blanchard to Sergeant Raymond after CL's CAC interview that Blanchard did not believe that the police had probable cause to arrest Cullen at that point in the investigation.  This argument is a nonstarter.  Even if Cullen could point to clearly established law requiring such statements to be disclosed - which he cannot - undisputed evidence in the record establishes that both Blanchard and his supervisor at the County Attorney's office were convinced that the police had probable cause to arrest when Chief Janvrin obtained the warrant on which Cullen was arrested.  <u>See</u> Doc. No. 16-28 at 4-5.  In light of this evidence, any doubts that Blanchard may have had at an earlier stage of the proceedings could not possibly be considered material to the probable cause determination.

of an obvious and unexplored reason to doubt the truthfulness of the allegations." 787 F.3d 44, 53 (1st Cir. 2015). If the officer has such knowledge, a failure to investigate further will violate the Fourth Amendment if: (1) the failure to investigate "evinced a reckless disregard for the truth as opposed to, say, mere negligence," (2) a reasonable investigation would have yielded additional information that should have been included in the warrant application; and (3) the information that would have been discovered during the investigation would negate a finding of probable cause. Id. at 54.

The court in Tanguay frankly acknowledged, however, that "[t]his duty of further inquiry is not well understood." Id. at 46. Prior to Tanguay, the First Circuit had repeatedly recognized as a general rule that a police officer "normally may terminate [his] investigation when he accumulates facts that demonstrate sufficient probable cause." Holder v. Town of Sandown, 585 F.3d 500, 505 (1st Cir. 2009) (quoting Acosta, 386 F.3d at 11). To the extent that the exception to the general rule recognized in Tanguay can be traced to a seminal decision, that decision appears to be B.C.R. Transport Co. v. Fontaine, 727 F.2d 7 (1st Cir. 1984). In B.C.R., a police officer was sued for executing warrants that were based primarily on a

report from an alleged crime victim.  In challenging jury
verdicts finding the officer liable because the warrants were
not supported by probable cause, the officer argued for a per se
rule that information supplied by an alleged crime victim always
establishes probable cause.  B.C.R., 727 F.2d at 9-10.  The
First Circuit rejected the proposed rule and instead required
courts to use the totality of circumstances approach that is
generally required when making a probable cause determination.
Id. at 10.  It then went on to conclude that the plaintiffs had
produced sufficient evidence to permit a jury to reject the
officer's qualified immunity defense.  In reaching that
conclusion, the court relied upon evidence that the officer had
obtained the warrants without "exhaust[ing] first-hand sources
of information readily available to him" even though the alleged
victim was "incoherent," and "sounded as if he was on drugs"
when he supplied the information.  Id. at 10-11.

Although subsequent First Circuit decisions have read
B.C.R. to stand for the proposition that an officer may have a
duty to investigate further before making an arrest on the basis
of an "incoherent" or "raving" individual's allegations, see,
e.g., Holder, 585 F.3d at 506; Acosta, 386 F.3d at 8, no court
prior to Tanguay had held a warrant invalid, or a police officer
liable for damages, based solely on the officer's decision to

20

execute a facially valid warrant without conducting additional investigation. Moreover, none of the decisions that predate Tanguay provide any clear guidance as to when a Fourth Amendment violation can be premised on an alleged failure to investigate.[14] Under these circumstances, I cannot conclude that only a plainly incompetent officer in the position of the defendants in 2011 would have failed to understand that additional investigation was required before Cullen could be arrested. Accordingly, Chief Janvrin and Sergeant Raymond are entitled to qualified immunity with respect to Cullen's failure to investigate claim.[15]

_____

[14] Even if clearly established law in 2011 obligated police officers who had developed probable cause to undertake further investigation before making an arrest in certain circumstances, that law had not been established with sufficient clarity to deprive the defendants in this case of qualified immunity. Chief Janvrin and Sergeant Raymond did not simply accept CL's initial report that she had been raped at face value. Instead, before proceeding, they (1) set up and observed a forensic interview with a person experienced in interviewing individuals with intellectual disabilities, (2) attempted to interview several members of the Cullen family, which failed only because the Cullens declined to be interviewed, and (3) executed a search warrant and recovered a gun that was consistent with the gun that CL claimed Cullen had brandished during the rape. Thus, this case is quite different from B.C.R., where the police relied exclusively on a "ranting" and "incoherent" individual without investigating "first hand sources of information readily available to" them. See B.C.R., 727 F.2d at 10.

[15] Because the law concerning the duty to investigate was not clearly established when defendants arrested Cullen, I need not determine whether CL's allegedly inconsistent and outlandish statements would be sufficient to require further investigation under Tanguay's "obvious and unexplored reason to doubt" test.

B.  **Municipal Liability Claim**

Cullen also argues that the Town of Fremont should be held liable for his arrest because Chief Janvrin was acting as a municipal policymaker when he arrested Cullen.

A municipality may not be held liable for an employee's unconstitutional acts based on a respondeat superior theory of liability.  Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 769 (1st Cir. 2010).  Instead, liability must be based on proof that the employee acted on the basis of a municipal policy or custom when he violated the plaintiff's constitutional rights.  Id.  A single act by a final municipal policymaker can serve as a basis for municipal liability, but only if it is undertaken deliberately and as an act of municipal policymaking.  Id.

In the present case, Cullen argues that Chief Janvrin was acting as a municipal policymaker when he obtained the arrest warrant and arrested him.  I am unpersuaded by this argument because undisputed evidence demonstrates that Janvrin was acting pursuant to the direction of a superior law enforcement officer rather than as a municipal policymaker when he obtained the warrant and arrested Cullen.

---

Tanguay, 787 F.3d at 53.  Nor need I determine whether Tanguay's other requirements for a constitutional violation have been met. See id.

Although a New Hampshire police chief possesses
policymaking power in certain areas, he is required by law to
act under the supervision of the Attorney General and his
deputies who work in the County Attorney's offices.  See N.H.
Rev. Stat. Ann. §§ 7:6, 7:11; Wyman v. Danais, 101 N.H. 487, 490
(1958); see also Ramsay v. McCormack, No. CIV. 98-408-JD, 1999
WL 814366, at *4-6 (D.N.H. June 29, 1999).  Accordingly, the New
Hampshire Supreme Court has recognized that "both the sheriff
and the local police have a duty to act in accordance with the
County Attorney's concept of law enforcement."  In re Ash, 113
N.H. 583, 587 (1973).

In the present case, the record demonstrates that the
ultimate decision to arrest Cullen was made by the County
Attorney's office rather than Chief Janvrin.  On December 16,
three days before Cullen was arrested, Deputy County Attorney
Reid ordered a meeting with Chief Janvrin to find out why Cullen
had not been arrested.  See Doc. No. 16-13 at 3.  Janvrin and
Deputy Chief Bassett came to the County Attorney's office, where
Reid "chair[ed] the meeting."  Doc. No. 16-28 at 4.  At that
meeting, the officials discussed whether to arrest Cullen or to
pursue an indictment through the grand jury.  Id. at 4-5.
Prosecutors apparently wanted to arrest immediately; the police
wanted to go before the grand jury.  Id.; Doc. No. 16-27.  The

prosecutors prevailed, and Reid ordered Janvrin to reword the affidavit and apply for a new warrant that same day, which Janvrin did. See Doc. Nos. 17-6 at 7; 16-11.  These facts thus show that the "decision to adopt a particular course of action" rested in the hands of the prosecutors, not the police.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).  Chief Janvrin cannot therefore be deemed a municipal policymaker when he obtained the warrant and arrested Cullen because he was simply executing an order given by a superior law enforcement officer.

I need go no further.  Because Janvrin was not a policymaker when he obtained the warrant and arrested Cullen, defendants are entitled to summary judgment on Cullen's municipal liability claim.

## C. State Law Claims for False Imprisonment and Malicious Prosecution

In addition to his federal claims, Cullen also brings state law claims for false imprisonment and malicious prosecution. These claims, however, present challenging questions of New Hampshire law that are better resolved by state courts, which can speak authoritatively on the subject.  Accordingly, I decline to exercise supplemental jurisdiction over the remaining state law claims.  See 28 U.S.C. § 1367(c)(3); see also Camelio

v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (holding that a
district court may decline jurisdiction after dismissing all
claims over which it has original jurisdiction).  Cullen's state
law claims are dismissed without prejudice to his right to
pursue them in a New Hampshire court if he so chooses.

## IV.  <u>CONCLUSION</u>

For the reasons set forth in this Memorandum and Order, I
grant the defendants' motion for summary judgment (Doc. No. 16)
on Cullen's federal claims and decline to exercise supplemental
jurisdiction over his remaining state law claims.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

November 19, 2015

cc:  Paul McEachern, Esq.
     Caroline Leonard, Esq.
     Charles P. Bauer, Esq.